# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MANUEL FRANCISCO GAMEZ,

        Defendant-Appellant.

UNPUBLISHED
February 2, 2016

No. 324199
St. Clair Circuit Court
LC No. 14-000185-FC

Before: SHAPIRO, P.J., and O'CONNELL and BORRELLO, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of two counts of premeditated first-degree murder, MCL 750.316, one count of first-degree criminal sexual conduct (CSC-I), MCL 750.520b (multiple variables), and two counts of torture, MCL 750.85. Defendant was sentenced as a habitual offender, third offense, MCL 769.11, to two sentences of life imprisonment for the first-degree murder convictions, 30 to 50 years' for the CSC-I conviction, and two sentences of 30 to 50 years' imprisonment for each of the torture convictions. For the reasons set forth in this opinion, we affirm.

## A. FACTS

Defendant's convictions arise out of the strangulation murder and sexual assault of Melissa Ichenberg and the stabbing murder of her roommate Danny McRoberts on the night of July 29, 2013, in Port Huron. On July 30, 2013, neighbors discovered the victims' bodies in the bathtub of Ichenberg's home after Ichenberg's six-year old daughter AI informed neighbors that her mother and "Manny" were asleep and would not awaken.

When police arrived at the crime scene, the interior of the home showed signs that someone attempted to clean up the scene. The linoleum tile floor in the kitchen area was wiped clean and there were bare or sock-clad footprints over the top of the wiped areas. There were multiple bloodstains throughout the home. Police preserved a blood stain that they discovered inside a kitchen drawer. Subsequent testing showed that the blood in the drawer matched defendant's DNA profile and a print expert testified that a footprint on the kitchen floor matched defendant's footprint.

Detective Karen Brisby conducted a forensic interview of six-year-old AI shortly after the murders. AI explained to Brisby that on the night of the murders, her mother's "weird

-1-

friend" came over. The friend was "weird" because AI did not know him, but at one point AI referred to the friend as "Manuel." The "weird friend" was sitting on her mother's bed. AI's mother told her it was time for bed and she went to bed. The "weird friend" was still there when she went to bed. The next morning, AI awakened and went to use the bathroom where she saw "a man and mommy sleeping in the bathtub." During a subsequent interview, AI stated that she "never heard mommy scream like that before."

Dr. Daniel Spitz, St. Clair County Chief Medical Examiner, performed the autopsies on the two victims. Dr. Spitz testified that Melissa had various abrasions and scrapes on her skin and bruises to her lower face and neck. Melissa had injuries to her neck that were indicative of manual strangulation and of ligature strangulation and he listed strangulation as the cause of death. Melissa's various injuries were indicative of a struggle and she had numerous injuries to her face, chin, neck, torso, upper chest, and extremities. Melissa suffered injuries to her mouth and lips that were consistent with a hand being placed over her mouth. Melissa's back showed signs of extensive trauma from her neck down to her buttocks and she suffered injuries to her scalp, which indicated that she suffered blows to the head. Melissa suffered small tears to the mucosa or lining of the anal cavity.

McRoberts suffered multiple stab and incise wounds to the face, neck and torso and had defensive wounds to the upper extremities. In total, McRoberts had 42 knife wounds to his body and Dr. Spitz testified that one of the wounds penetrated clear through McRoberts neck, indicating that the knife used in the assault had to have been at least five-inches in length. Dr. Spitz agreed that knife tip marks on linoleum tile at the crime scene could have been caused by the stabbings that went through McRoberts' neck.

Dr. Spitz reviewed photographs that police took of defendant a couple days after the murders. Dr. Spitz testified that defendant had sharp force injuries to the palm of his hand and had some "incised wounds." The injuries were consistent with losing control of a knife and the hand having come into contact with the knife blade. The wounds were not defensive in nature.

A prosecution witness testified that sometime before the murders, Melissa expressed her concern that defendant was stalking her. Melissa did not want to go to the police because she was dating defendant's brother Jose Gamez and did not want to cause "family drama."

During the days immediately after the murder, defendant made statements to several friends and family members that showed that he had information about the murders. Aimee Feiler testified that she knew members of defendant's family because she previously dated defendant's brother Jose. Feiler explained that during the summer of 2013, Jose and Melissa were involved in a dating relationship. Jose lived in Port Huron with two of his children and with defendant and Minerba Gamez, who were both his siblings. Feiler was friends with Minerba and she would stop by Jose's house on occasion. During the early evening hours of July 29, 2013, Feiler picked up Minerba at Jose's home at approximately 3 or 4 p.m. Minerba planned to spend the night at Feiler's house and defendant, who did not own a car, asked Feiler if he could ride along because he was going to do a tattoo for someone "on the north side." Feiler agreed, and defendant put his bicycle in the back of Feiler's pickup truck and the three drove to Feiler's residence. Defendant stayed at Feiler's residence for about 30 or 45 minutes and then took his bag of tattoo equipment and rode away on his bicycle. Several of Melissa's neighbor's

testified at trial that they noticed an unfamiliar bike parked outside Melissa's home on the night of the murders.

Feiler testified that on July 31, 2013, defendant spoke of the murders to both her and Minerba. Defendant stated that he went to Melissa's house on July 29, 2013, to do a tattoo, but Melissa did not have any money for the tattoo. Defendant stated that he and Melissa eventually had consensual sex, but stated that he used a condom and then flushed it down the toilet. Defendant stated that Melissa was fine when he left her house late in the evening, but he recalled seeing two men standing outside near the home. According to Feiler, defendant was "paranoid" that police would find his fingerprints inside Melissa's home.

Jose Gamez testified that he spoke with defendant after the murders and defendant stated that he had been with Melissa on the night she was murdered. Defendant told Jose that he saw men outside Melissa's townhome, and Jose told defendant that he needed to go to the police.

On August 1, 2013, at about 11:30 a.m., Jose drove defendant to the Port Huron Police Department for an interview. The interview can be broken into four distinct timeframes: (1) a conference room interview from 11:50 a.m. to about 3:30 p.m.; (2) a conference room interview from about 3:30 p.m. to about 6:20 p.m.; (3) a polygraph interview in the office of Lt. Robert Dykstra from about 6:22 p.m. until about 9:30 p.m.; (4) a post-booking interview from about 10:00 p.m. until about 12:00 a.m. The following is an overview of each portion of the interview:

PRE-*MIRANDA* INTERVIEW (11:50 a.m. to 3:30 p.m.[1]):

Upon arrival at the police department, Deputy Martin Stoyan brought defendant to a large conference room that had large windows overlooking a river where Stoyan and Detective Robert Kerrigan proceeded to interview defendant. Stoyan and Kerrigan were in plain clothes and interviewed defendant from 11:50 a.m. until about 3:30 p.m. (hereinafter referred to as "Conference Room Interview 1"). Neither Stoyan nor Kerrigan apprised defendant of his *Miranda*[2] rights. Both Stoyan and Kerrigan testified that defendant was not in custody until about 3:30 p.m. when defendant's parole officer entered a parole detainer. According to the officers, prior to 3:30 p.m., defendant was free to leave. Defendant was not physically restrained and he was provided access to a restroom. From 11:50 a.m. to 3:30 p.m., defendant did not admit to committing any crimes. According to Kerrigan, defendant appeared fine, he answered questions voluntarily, and he appeared alert and did not appear to be under the influence of drugs or alcohol. When defendant repeatedly stated that he was hungry, Kerrigan offered defendant a Power Bar, water, and an apple, but defendant declined. Defendant did not admit to committing the crimes during this initial interview and the trial court held that the interview was admissible because defendant was not in custody.

PRE-*MIRANDA* INTERVIEW (3:30 p.m. to 6:20 p.m.):

---

[1] The timing is approximate based on testimony at trial and at a *Walker* hearing.

[2] *Miranda v Arizona*, 384 US 436, 458; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

At about 3:30 p.m., on Kerrigan's request, Officer Jeremy Young entered the conference room to photograph cuts and injuries that defendant had on his body. Young informed defendant that he was not going anywhere because of a parole issue. Young asked defendant if he was hungry and stated that some of the cadets were going to McDonald's and would get something for defendant. Defendant did not respond, but Young eventually provided defendant with a cheeseburger meal from McDonald's.

At a *Walker*[3] hearing, Young agreed that as of 3:30 p.m., defendant was in custody and not free to leave. However, Young did not advise defendant of his *Miranda* rights because he was unaware if any of the other officers had already advised defendant of his rights.

From 3:30 p.m. until about 6:18 p.m., Young and Stoyan continued to question defendant despite having failed to advise defendant of his *Miranda* rights (hereinafter referred to as "Conference Room Interview 2"). During this phase of the interview, defendant's statements became more incriminating, but he did not admit to killing either of the victims and he denied having sex with Melissa. At one point, defendant stated, "either way it goes, I am f------," and stated that he was in "the wrong place at the wrong time." Defendant proceeded to tell a fantastical narrative of how, at one point during the evening, he stepped outside Melissa's house to smoke when he heard a loud "thud" inside the home. Defendant reentered the home and, upon hearing noises, hid underneath some laundry while an unidentified man stabbed McRoberts. Later, when defendant reemerged from hiding, he saw McRoberts' dead body lying in the living room. Defendant vomited when he saw the blood and slipped in the living room and his face, hands, and mouth became covered in blood. Defendant also stated that he saw that someone dragged McRoberts' body upstairs to the bathtub and he saw McRoberts and Melissa in the tub at some point. Defendant turned the water off in the tub. Fearing that he would be blamed for the murder, defendant proceeded to clean the crime scene and then left the home at 6:00 a.m.

At about 6:00 p.m., defendant accepted Young's offer to take a polygraph test on condition that he be allowed to call his brother Jose. Young agreed and provided defendant with a telephone. Defendant made statements during the phone call that mirrored the version of events that he had just relayed to Stoyan and Young.

At a *Walker* hearing, the prosecution stipulated that Conference Room Interview 2 was inadmissible because defendant was in custody and police interrogated him without advising him of his *Miranda* rights. However, the trial court held that *Miranda* was not triggered even after Young told defendant he was not free to leave. The court reasoned that even though defendant was not free to leave, there was nothing about the environment that changed to make it coercive. The court found that defendant was not subject to custodial interrogation because he was not in a "coercive, intimidating environment."[4] The court also found that defendant's statements during

---

[3] *People v Walker (On Rehearing)*, 374 Mich 331, 338; 132 NW2d 87 (1965).

[4] On appeal, the state contends that the prosecution "stipulated that it would not introduce statements from the portion of the interview between 3:30 p.m. up to and until the point where the Appellant was read his *Miranda* rights . . . due to the fact that the Appellant was in custody during that time." The state fails to comprehend that, despite the prosecutor's stipulation, the

-4-

his telephone call to Jose were admissible, reasoning that these statements were not the result of custodial interrogation because they were not responses to questions from a police officer. Following the court's ruling, apart from references to a polygraph, at trial, the prosecution introduced the entire recording and transcript of Conference Room Interview 2.

### POLYGRAPH EXAMINATION (6:18 p.m. to 9:30 p.m.):

At about 6:18 p.m., Stoyan and Young transferred defendant to Lt. Robert Dykstra's office for a polygraph examination after allowing defendant to use the restroom and refill his water bottle. Dykstra immediately advised defendant of his *Miranda* rights and defendant acknowledged he understood his rights and signed a waiver form. Dykstra testified at the *Walker* hearing that defendant did not appear deprived of food or sleep, was not taking medication, but stated that he had smoked one marijuana joint in the past 24 hours. Defendant previously had seen a psychiatrist as part of an exit interview when he was released from prison a couple years earlier on a different conviction, but otherwise did not have any psychological issues.

Dykstra took about an hour to do a pre-test interview with defendant where defendant waived his *Miranda* rights. Dykstra then allowed defendant to take about a 30-minute break while he prepared the testing equipment. Defendant went to the restroom and refilled his water bottle. After that, Dykstra conducted the polygraph examination, which took about an hour.

The trial court barred any reference to the polygraph test at trial,[5] but allowed Dykstra to testify about the statements defendant made during the pre and post-test interview. The court found that defendant waived his *Miranda* rights and voluntarily made statements to Dykstra. At trial, Dykstra testified that defendant told him that he witnessed an intruder stab McRoberts.

### POST-*MIRANDA* INTERVIEW (9:30 p.m. to 12:00 a.m.):

After Dykstra completed the polygraph examination, defendant was booked. The booking process took about 30 minutes and Stoyan gave defendant a piece of pizza. Thereafter, at about 10:00 p.m., Young and Stoyan continued questioning defendant in a "booking room." At the outset, after a few questions, Stoyan reminded defendant that Dykstra had advised him of his *Miranda* rights and that defendant had signed the *Miranda* form. Stoyan then asked defendant "[d]o you have any more questions on that," and defendant replied "no," and the interrogation continued.

After repeating his original narrative, defendant eventually admitted to stabbing McRoberts, but claimed he acted in self-defense after McRoberts killed Melissa. Defendant also admitted that he had consensual sex with Melissa, but denied that he killed her.

---

trial court nevertheless held that all of defendant's statements were admissible and the prosecutor introduced the statements at trial.

[5] Evidence of the polygraph was not introduced at trial and none of the officers referenced the polygraph during their trial testimonies.

Young testified at a *Walker* hearing that at about 10:30 or 10:45 p.m., defendant fell to his knees crying and admitted to stabbing McRoberts while dry-heaving and "spitting" into a wastebasket. Young stated that it did not appear that defendant shed "real tears" and defendant did not vomit "authentic vomit." Young stated that defendant had just eaten pizza and did not appear to vomit from the pizza. Young did not believe that defendant needed medical attention. Young testified that the interview ended at about 12:00 a.m. when defendant demanded to be taken home or taken to jail. Before that, Young testified that defendant did not tell police to stop questioning him.

The trial court held that statements made during the booking room interview were voluntary and admissible. The court found that defendant was reminded of his *Miranda* rights, the questioning was not inherently coercive or intimidating, and there was no undue pressure. The court reasoned that defendant had prior experience with police and there was an ongoing effort by police to provide him with food and water.

Finally, defendant made a statement on the morning after the interview during the pre-arraignment process. Specifically, Marian Pike, who worked in pre-trial services for the Port Huron County Sheriff's Department, testified that she filled out a pre-arraignment form with defendant's name, address, and employment status. When she was asking defendant for this information, defendant stated, "I only killed one." Defendant did not raise a constitutional challenge with respect to Pike's testimony.

### OTHER-ACTS EVIDENCE

At trial, the prosecution introduced evidence of the circumstances surrounding defendant's prior conviction of second-degree home invasion. Kristine Seppo testified that in September 2005 she was age 23 and living in her parent's home in Port Huron. Shortly after defendant moved two houses down from her home, she rejected defendant's advances and informed him that she was not interested in being in a dating relationship with him. Seppo explained that, sometime thereafter, defendant broke into her parents' home and entered her bedroom during the early morning hours of September 14, 2005, when her dad was out of town. Defendant placed his hand over her mouth and began strangling her. Eventually, she and defendant fell onto the floor fighting. Defendant got up and ran out the door when he heard the family's pet pit bull barking down the hallway. Defendant ultimately pleaded guilty to second-degree home invasion for the incident and admitted breaking into Kristen's bedroom.

The prosecution argued that the prior assault showed that defendant acted according to a common plan or scheme when he assaulted Melissa and that defendant had motive and intent to kill Melissa and McRoberts because, unlike the prior assault, this time defendant did not want to leave any witnesses.

### EVIDENCE OF JAILHOUSE TELEPHONE CALLS

The prosecution introduced evidence of two telephone calls that defendant placed to a female friend from jail while he was awaiting trial. During the first phone call, defendant stated that a voice in his head committed the crimes as follows:

> *Female Voice*. Did you do this?

*Defendant.* Me, myself? No. But the voice that I hear in my head did. So my mind, no. From my body, yes. But I don't remember none of it. I found out the next day when I woke up that my body was sore and I had cuts on my hand, and I asked myself, the voice that I hear in my head, what happened, and he told me what happened. And I cried and I cried.

During the second telephone call, defendant stated:

I told you earlier, when I got home, I seen these cuts and bruises, I knew something was wrong and I sat there and I asked him, I said to myself, like: Herman, what happened? Why am I like this? Why am I - - why do my things hurt? Why, why do I have cuts? And he told me what happened. He told me that he strangled her. He told me that he stabbed him. And he told me how he cleaned the whole house. I don't, I don't remember none of that . . . Every time I close my eyes I see these two people laying in front of me.

Defendant was convicted and sentenced as set forth above. This appeal ensued.

## B. ANALYSIS

## I. FIFTH AMENDMENT

Defendant contends that the trial court erred in denying his motion to suppress the statements he made to police during the interview. Defendant contends that once he was informed that he was not free to leave, police were required to advise him of his *Miranda* rights and that failure to do so should have precluded admission of all of the statements he made after that point forward.

We review de novo a trial court's ruling on a motion to suppress evidence. *People v Henry (After Remand)*, 305 Mich App 127, 137; 854 NW2d 114 (2014). The trial court's factual findings, if any, are reviewed for clear error, while underlying constitutional issues are reviewed de novo. *Id.* To the extent we find that a constitutional error occurred, "[w]e review preserved issues of constitutional error to determine whether they are harmless beyond a reasonable doubt." *People v Dendel (On Second Remand)*, 289 Mich App 445, 475; 797 NW2d 645 (2010). "A constitutional error is harmless if [it is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Id.* (quotation marks and citations omitted).

"In *Miranda*, the Supreme Court of the United States determined that the coercive nature of custodial interrogations implicated a defendant's Fifth Amendment right to be free from compelled self-incrimination." *People v Vaughn*, 291 Mich App 183, 188-189; 804 NW2d 764 (2010) aff'd in part, vacated in part on other grounds, 491 Mich 642 (2012), citing *Miranda v Arizona*, 384 US 436, 458; 86 S Ct 1602; 16 L Ed 2d 694 (1966). To safeguard against coercion, the *Miranda* court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 US at 444. "Accordingly, before conducting a custodial interrogation, the interrogating officer must advise the suspect of [his or her constitutional] rights." *Vaughn*, 291

Mich App at 189. "[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Miranda*, 384 US at 479. "However, the [*Miranda*] Court limited the requirement to custodial interrogations—that is, interrogations that have a heightened risk of improper coercion." *Vaughn*, 291 Mich App at 189, citing *Miranda*, 384 US at 444. "Thus, a police officer is only required to give the warnings when a suspect is in custody." *Id.*, citing *Stansbury v California*, 511 US 318, 322; 114 S Ct 1526; 128 L Ed 2d 293 (1994).

An issue in this case is determining when defendant was in custody for purposes of *Miranda*. To determine whether a defendant was in custody at the time he was interrogated, a court must examine "all of the circumstances surrounding the interrogation and determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Yarborough v Alvarado*, 541 US 652, 663; 124 S Ct 2140; 158 L Ed 2d 938 (2004) (quotation marks and citations omitted). "A key question is whether, under the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave—that is, was there a formal arrest or a restraint on freedom of movement of the degree associated with formal arrest." *Vaughn*, 291 Mich App at 189 (citations omitted).

*PRE-MIRANDA STATEMENTS:*

In this case, the trial court did not err in determining that the statements defendant made at the outset of the interview from 11:50 a.m. to 3:30 p.m. (Conference Room Interview 1) were admissible. Although defendant was not advised of his *Miranda* rights, the totality of the circumstances shows that defendant was not in custody during this initial portion of the interrogation. Defendant arrived at the police department voluntarily. Defendant was in a large, open conference room and he was not physically restrained or handcuffed. The officers interviewing defendant wore plain clothes and defendant had access to a restroom. Police did not inform defendant that he had to stay in the conference room and defendant did not indicate that he wanted to terminate the interview. Under these circumstances, it does not appear that there was "a restraint on freedom of movement of the degree associated with formal arrest." *Vaughn*, 291 Mich at 189; *Yarborough*, 541 US at 663. Accordingly, police were not required to advise defendant of his Fifth Amendment rights and the statements defendant made during this initial interview were admissible. *Id.*

Similarly, the trial court did not err in admitting statements that defendant made during the telephone call to Jose. These statements were not the product of interrogation or other state action and therefore *Miranda* was not implicated. See e.g. *People v Armendarez*, 188 Mich App 61, 73; 468 NW2d 839 (1991) (holding that *Miranda* is not implicated where statements are made that are not in response to interrogation); *Arizona v Mauro*, 481 US 520, 527-530; 107 S Ct 1931; 95 L Ed 2d 458 (1987) (holding that statements the defendant made during a telephone call to his wife in the presence of an officer were not barred under the Fifth Amendment because they were not made during a custodial interrogation).

With respect to the police interrogation from 3:30 p.m. to the time defendant made the telephone call to Jose (Conference Room Interview 2), despite the prosecution's stipulation that it would not use any of defendant's statements during this timeframe, the trial court egregiously erred as a matter of law when it held that defendant was not entitled to his *Miranda* rights absent

coercive tactics employed by the police. The law governing when *Miranda* is triggered is well-settled and is a fundamental component of any basic criminal procedure course: irrespective of tactics employed, "before conducting a custodial interrogation, the interrogating officer must advise the suspect of [his or her constitutional] rights." *Vaughn*, 291 Mich App at 189; *Miranda*, 384 US at 444. This is because "[f]ailure to administer [*Miranda*] warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary . . . must nevertheless be excluded from evidence under [*Miranda*]." *Oregon v Elstad*, 470 US 298, 307; 84 L Ed 2d 222; 105 S Ct 1285 (1985).

In this case, the state does not contest that defendant was in custody starting at 3:30 p.m. Thus, at that point, police were constitutionally required to advise defendant of his Fifth Amendment rights before engaging in any further questioning. *Miranda*, 384 US at 444. Because Young failed to do so before continuing the interrogation, Young violated defendant's Fifth Amendment rights. *Id*. Accordingly, apart from the telephone call, the trial court should have suppressed all of defendant's statements from 3:30 p.m. until defendant waived his *Miranda* rights at about 6:30 p.m. when he was in Dykstra's office. The failure to do so amounted to constitutional error and we must determine whether it is "clear beyond a reasonable doubt that a rational jury would have found [] defendant guilty absent the error." *Dendel*, 289 Mich App at 475.

The pre-*Miranda* custodial statements that defendant made were harmful to the defense. Although defendant did not admit to killing either of the victims, defendant made statements that were somewhat incriminating. Defendant told a fantastical narrative that he hid in the laundry room while some unidentified men killed Melissa and McRoberts before he slipped in blood and cleaned up the crime scene. Defendant's narrative contrasted with what he first told police and it was not believable and suggested that he was the one who killed both the victims and then cleaned the crime scene to cover up his involvement in the murders.

Although defendant's statements were prejudicial, the prosecution introduced a substantial amount of other evidence of defendant's guilt such that, even absent the constitutional error, a rational jury would have found defendant guilty beyond a reasonable doubt. *Dendel*, 289 Mich App at 475. Specifically, there was overwhelming evidence that defendant was at Melissa's house at the time of the murders. Witnesses testified that they saw a bike parked in front of Melissa's house that matched the description of defendant's bike. There was testimony that, shortly before the murders, Melissa informed a friend that defendant was stalking her and there was evidence that defendant attempted to contact Melissa on July 4, 2013. Melissa's six-year-old daughter stated during a forensic interview that a man named "Manuel" was in her mother's bedroom immediately before she went to bed on the night of the murders and the child then heard her mother screaming during the same night. In addition, during the days following the murders, defendant told Feiler and Jose that he was at Melissa's house on the night of the murders. Feiler testified that defendant told her that he had sex with Melissa and he was "paranoid" that police would find his prints at the crime scene, which was indicative of defendant's consciousness of guilt. See e.g. *People v Unger*, 278 Mich App 210, 225-226; 749 NW2d 272 (2008).

Evidence not only showed that defendant was at Melissa's house on the night of the murders, but scientific evidence also placed defendant in the home at the time of the murders and

after the murders during the cleanup. Crime scene technicians testified that there was evidence that someone wiped the tile floor in the kitchen clean and there were bare or sock-clad footprints over the top of the cleaned floor. A print expert testified that one of the footprints near the kitchen sink matched defendant's footprint, which supported the inference that defendant was the person who attempted to clean the crime scene to conceal his involvement in the murders. See *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000) (circumstantial evidence and reasonable inferences arising therefrom can constitute proof of the elements of a crime); *Unger*, 278 Mich App at 226 (attempts to conceal evidence at a crime scene is indicative of consciousness of guilt).

Moreover, a DNA expert testified that defendant's DNA matched the DNA of a blood droplet discovered inside a kitchen drawer. Finally, Dr. Spitz testified that the victims had multiple injuries that showed signs of a struggle. Police photographed injuries on defendant's body within days of the murders that supported the inference that defendant was the man that the victims struggled against.

In addition, the prosecution introduced other-acts evidence that supported that defendant had motive and intent to commit the crimes and that strangulation was his modus operandi. MRE 404(b). Evidence of the prior attack on Seppo supported the inference that, after Melissa rejected defendant's advances, defendant assaulted Melissa in the same manner as he assaulted Seppo. Defendant's prior conviction supported the inference that he had motive and intent to kill any potential witnesses after he sexually assaulted Melissa because, this time, he did not want to go to prison for the assault. See e.g. *Unger*, 278 Mich App at 223 (while not an element of the crime, "evidence of motive in a prosecution for murder is always relevant").

Finally, the prosecution introduced incriminating statements that defendant voluntarily made that were not the products of custodial interrogation. Defendant called Jose at some point while he was at the police department and stated that he witnessed someone kill the victims. This narrative conflicted with what defendant previously told Jose and was indicative of defendant's consciousness of guilt. See *id*. at 225-226 ("[C]onflicting statements tend to show a consciousness of guilt") (quotation marks omitted)). Additionally, during the pre-arraignment phase, defendant made an unsolicited statement that he "only killed one" of the victims. Furthermore, defendant made two telephone calls from jail wherein he admitted that his "body" strangled Melissa and stabbed McRoberts.

In sum, apart from the inadmissible statements, there was substantial evidence of defendant's guilt such that a rational jury would have found defendant guilty beyond a reasonable doubt even absent the court's constitutional error. *Dendel*, 289 Mich App at 475. Accordingly, defendant is not entitled to a new trial on this basis. *Id*.

## *POST-MIRANDA STATEMENTS:*

The trial court did not err in holding that the statements defendant made from 6:30 p.m. until about 12:00 a.m. were admissible. Dykstra advised defendant of his *Miranda* rights before he conducted the polygraph examination. Defendant did not dispute that he signed a form acknowledging and waiving his rights. After the polygraph and booking process an officer reminded defendant of the form he had signed and defendant stated he did not have questions

about the form.  On appeal, defendant does not dispute that Dykstra advised him of his *Miranda* rights or that he waived his rights.  Instead, defendant argues that his post-*Miranda* statements should be suppressed pursuant to *Missouri v Seibert*, 542 US 600, 624; 124 S Ct 2601; 159 L Ed 2d 643 (2004).  In contrast, the state argues that all of defendant's post-*Miranda* statements are admissible pursuant to *Elstad*, 470 US at 298.

In *Elstad*, two police officers went to arrest the young defendant at his parent's home on a burglary charge.  *Id*. at 301.  Before the arrest and before the defendant was advised of his *Miranda* rights, one of the officers sat with the defendant in the living room and stated that he thought that the defendant was involved in the burglary.  *Id*.  The defendant agreed that he had been at the scene.  *Id*.  The defendant was arrested and taken to the police department where, after being advised of his *Miranda* rights, provided a full confession.  *Id*.

The *Elstad* Court held that the subsequent confession was not barred as improper "fruit" of the prior *Miranda* violation, explaining:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.  Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.  [*Elstad*, 470 US at 309.]

* * *

> We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.  A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.  In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.  [*Id*. at 314.]

In *Seibert*, 542 US at 609, the Court addressed the constitutionality of "interrogating in successive, unwarned and warned phases."  In that case, police arrested the defendant on murder charges and took her to the police department for questioning.  *Id*. at 605-606.  Once at the department, police deliberately refrained from advising the defendant of her *Miranda* rights.  *Id*. After the defendant confessed and took a smoke break, police provided the *Miranda* warnings and had the defendant repeat her prior confession.  *Id*.  In addressing whether the mid-stream warnings complied with the mandates of *Miranda*, the *Seibert* Court explained:

> The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires.  Could the warnings effectively

advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment. [*Id*. at 611-612.]

The *Seibert* Court held that, under the circumstances of that case, the subsequent confession violated the Fifth Amendment because it was obtained using police tactics "dedicated to draining the substance out of *Miranda*" such that the mid-stream warnings did not effectuate the requirements of *Miranda*. *Seibert*, 542 US at 617-618. In reaching this conclusion, the *Seibert* Court distinguished *Elstad*, explaining, "it is fair to read *Elstad* as treating the living room conversation as a good-faith *Miranda* mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn-first practice generally." *Seibert*, 542 US at 615. "At the opposite extreme," the *Seibert* Court explained,

> are the facts here, which by any objective measure reveal a police strategy adapted to undermine the *Miranda* warnings. The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. [*Id*. at 616 (footnote omitted).]

The Court concluded that:

> The contrast between *Elstad* and this case reveals a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first. [*Seibert*, 542 US at 615 (footnote omitted).]

In this case, the *Miranda* warnings provided by Dykstra were effective given the facts and circumstances. *Seibert*, 542 US at 611-612. Unlike in *Seibert*, in this case the evidence does not support that police employed a strategy "adapted to undermine" the *Miranda* warnings. *Id*. at 616. Here, defendant voluntarily appeared at the police department. Police interviewed defendant for over three hours when defendant was not in custody. When Young informed defendant that he was not free to leave, Young continued the interrogation without advising defendant of his *Miranda* rights. However, unlike the officer in *Seibert*, Young did not testify that he deliberately failed to provide the *Miranda* warnings in an attempt to compel defendant to confess. Rather, Young stated that he was unsure if any of the other officers had already advised defendant of his rights.

Moreover, unlike in *Seibert*, in this case, defendant did not confess prior to being advised of his rights. Instead, defendant made incomplete and vague statements about how he witnessed other men commit the crimes. Thus, there was low overlap between the unwarned and warned statements. *Id*. at 615. In addition, the setting changed after defendant was advised of his *Miranda* rights in that defendant underwent a polygraph examination and went to booking and a formal interrogation room. Defendant was no longer in the conference room, but rather was moved to a more formal interrogation room after being provided several breaks. Given all of the circumstances, it is reasonable to conclude that the warnings effectively advised defendant that he had a "real choice about giving an admissible statement at that juncture," and that he could "choose to stop talking" even though he talked earlier. *Id*. at 611-612. In short, this case is governed by *Elstad*, 470 US at 298, such that the *Miranda* violation did not taint the subsequent confession after defendant waived his rights.

To the extent that defendant contends that his post-*Miranda* statements were inadmissible because his waiver or statements were involuntary, this argument fails.

"The test of voluntariness should be whether, considering the totality of all the surrounding circumstances, the confession is the product of an essentially free and unconstrained choice by its maker, or whether the accused's will has been overborne and his capacity for self-determination critically impaired." *People v Cipriano*, 431 Mich 315, 333-334; 429 NW2d 781 (1988) (quotation marks and citations omitted).

> In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id*.]

In this case, although the entire interrogation process took nearly 12 hours, the totality of the circumstances does not support that defendant's statements or his waiver were involuntary. *Id*. At the time of the interrogation, defendant was over the age of 30 and had previous experience with the police arising from misdemeanor drug charges and a felony home invasion. Defendant was familiar with the *Miranda* process and had previously spent time in prison. Police provided defendant ongoing access to a restroom, he was not physically restrained at any point during the interrogation, and he was afforded the opportunity to call his brother. In addition, police offered defendant food and water throughout the interrogation, including a McDonald's meal and pizza. Defendant had a 30-minute break before the polygraph test. Defendant was not detained for the entire time he was at the police department. Instead, defendant voluntarily appeared at the police department for the interview and he was not in custody for the first 3-½ hours of the process.

-13-

Defendant was not physically abused or threatened with physical abuse and Dykstra testified that defendant did not appear deprived of sleep or food and was not under the influence of intoxicants. Dykstra testified that defendant did not appear to have any psychological issues. Defendant was advised of his *Miranda* rights at about 6:30 p.m. and was reminded of the waiver form and asked if he had any questions about the form when the interrogation resumed at about 10:00 p.m. While defendant indicated that he was tired and ready to go home during the final hours of the interrogation, defendant did not unequivocally assert his right to silence or request an attorney. And, although defendant appeared to be under stress as the questioning wore on, Young testified that defendant did not actually vomit and stated that defendant was not actually crying. In short, given the totality of the circumstances, defendant's waiver and statements to police were not involuntary. *Cipriano*, 431 Mich at 333-334.

In sum, the trial court erred in part when it denied defendant's motion to suppress his statements where defendant was subjected to custodial interrogation from about 3:30 p.m. to about 6:20 p.m. and where police failed to advise defendant of his *Miranda* rights during this timeframe. However, the constitutional error was harmless beyond a reasonable doubt where the court properly admitted the other statements that defendant made and where there was a substantial amount of other evidence of defendant's guilt.

## II. APPOINTMENT OF EXPERT WITNESS

Before trial, defendant moved for appointment of an expert in "police interrogating methods and false confessions." Defendant argued that he made incriminating statements after a lengthy interrogation such that he needed an expert to review the interrogation and offer testimony on the indicia that commonly produces false confessions. Furthermore, defendant argued, the relative lack of physical evidence, supported that his confession was false. The court denied defendant's motion, reasoning that defendant failed to show a connection between the facts and the need for an expert witness. On appeal, defendant contends that the trial court erred in denying his motion.

We review a trial court's decision on a motion to appoint expert witnesses for an abuse of discretion. *People v Tanner*, 469 Mich 437, 442; 671 NW2d 728 (2003). "At its core, an abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome." *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*.

Pursuant to the Due Process Clause, "states may not condition the exercise of basic trial and appeal rights on a defendant's ability to pay for such rights." *People v Leonard*, 224 Mich App 569, 580; 569 NW2d 663 (1997), citing *Ake v Oklahoma*, 470 US 68; 105 S Ct 1087; 84 L Ed 2d 53 (1985). Fundamental fairness precludes a state from denying indigent defendants "an adequate opportunity to present their claims fairly within the adversary system." *Id.* (quotation marks and citations omitted). However, "a trial court is not compelled to provide funds for the appointment of an expert on demand." *Tanner*, 469 Mich at 442. Rather, "to obtain appointment of an expert, an indigent defendant must demonstrate a nexus between the facts of the case and the need for an expert." *Id*. at 443 (quotation marks and citations omitted). "Without an indication that expert testimony would likely benefit the defense, a trial court does not abuse its

discretion in denying a defendant's motion for appointment of an expert witness." *Id.* (quotation marks omitted).

In this case, the trial court did not abuse its discretion in denying defendant's motion for appointment of an expert in false confessions because defendant failed to show more than a "mere possibility" that the expert's testimony would be beneficial to the defense. *Tanner*, 469 Mich at 443. Here, defendant made statements to police that were corroborated by evidence at the crime scene and showed that he was in the home at the time of and after the murders. In addition, immediately after the murders, defendant made statements to acquaintances that showed he was at the scene on the night of the murders and he had numerous injuries on his body that supported the inference he was involved in the violent murders. Defendant also confessed to Pike that he "only killed one of them" during the pre-arraignment process and admitted to his girlfriend during two jailhouse telephone calls that he committed the crimes. Finally, other-acts evidence showed that defendant had motive and intent to kill the victims and that strangulation of female victims was his modus operandi. In short, on this record the trial court did not abuse its discretion in denying defendant's motion where defendant failed to show how an expert in false confessions "would likely benefit the defense." *Tanner*, 469 Mich at 443.

## III. SUFFICIENCY OF THE EVIDENCE

Next, defendant contends that there was insufficient evidence to support his CSC-I and torture convictions.

We review de novo a challenge to the sufficiency of the evidence. *People v Cline*, 276 Mich App 634, 642; 741 NW2d 563 (2007). "In reviewing the sufficiency of the evidence in a criminal case, we must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt." *People v Hoffman*, 225 Mich App 103, 111; 570 NW2d 146 (1997).

With respect to the CSC-I charge, the trial court instructed the jury on three alternative theories of CSC-I: (1) sexual penetration occurred under circumstances involving the commission of torture or first-degree murder; (2) sexual penetration occurred when the actor was armed with a weapon or any article used or fashioned in a manner to lead the victim to reasonably believe it to be a weapon; and (3) sexual penetration occurred and the actor caused personal injury to the victim and force or coercion was used to accomplish sexual penetration. See MCL 750.520b(1)(c) (e) (f).

In this case there was sufficient evidence to allow a rational juror to conclude beyond a reasonable doubt that defendant was guilty of CSC-I under any of the three alternative theories. Here, evidence showed that there was forcible penetration. Dr. Spitz testified that there were small tears to the anal mucosa. Defendant admitted both to acquaintances and to police that he had sex with Melissa. While defendant claimed that he had consensual sex, the jury was free to conclude that defendant was not credible and that he accomplished the penetration through force and without Melissa's consent. See *People v Avant*, 235 Mich App 499, 506; 597 NW2d 864 (1999) ("Questions of credibility are left to the trier of fact and will not be resolved anew by this Court."). Moreover, it was plainly apparent that violence was perpetrated upon Melissa given

the numerous injuries that she had on her body and given that she was murdered. The evidence of the wounds and the manner of death, coupled with the evidence of penetration would have allowed a rational juror to conclude beyond a reasonable doubt that defendant engaged in an act of sexual penetration under any of the three theories set forth above. *Hoffman*, 225 Mich App at 111.

Defendant appears to contend that his statements should not have been admitted to prove CSC-I because the corpus delicti rule provides that "a defendant's confession may not be admitted unless there is direct or circumstantial evidence independent of the confession establishing (1) the occurrence of the specific injury . . . and (2) some criminal agency as the source of the injury." *People v Konrad*, 449 Mich 263, 269-270; 536 NW2d 517 (1995). Defendant appears to contend that there was no independent evidence establishing the CSC-I because Dr. Spitz agreed that the tears in the anal mucosa could have occurred during consensual sex. This argument lacks merit.

In this case, independent of defendant's statements, there was evidence to support the CSC-I conviction. While Dr. Spitz agreed on cross-examination that the tears could have occurred during consensual sex, he also explained that, in context of all of the other injuries, "it fits with the overall being an altercation and . . . an assault." This testimony, coupled with evidence of all of the injuries that were inflicted upon Melissa, amounted to evidence of CSC-I independent of defendant's statements and defendant's argument concerning the corpus delicti rule fails as a matter of law. *Konrad*, 449 Mich at 269-270.

With respect to torture, torture occurs when "[a] person ..., with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control . . . ." MCL 750.85(1). The term "cruel" is defined as "brutal, inhuman, sadistic, or that which torments." MCL 750.85(2)(a). "Severe mental pain or suffering" is defined in relevant part to include:

> [A] mental injury that results in a substantial alteration of mental functioning that is manifested in a visibly demonstrable manner caused by or resulting from any of the following:
>
> (*i*) The intentional infliction or threatened infliction of great bodily injury.
>
> * * *
>
> (*iii*) The threat of imminent death.
>
> (*iv*) The threat that another person will imminently be subjected to death, great bodily injury, or the administration or application of mind-altering substances or other procedures calculated to disrupt the senses or personality. [MCL 750.85(2)(d).]

The trial court instructed the jury consistent with the statutory language.

On appeal, defendant focuses on the intent element of torture, arguing that there was no evidence to support that he intended to cause cruel or extreme physical or mental pain and

-16-

suffering. Defendant cites Dr. Spitz's testimony that once compression on Melissa's neck was sufficient, death could have occurred very quickly. Dr. Spitz explained that death could have occurred within 45 seconds to a minute, or within 10 to 15 seconds. With respect to McRoberts, the evidence supported that there was a violent struggle. Defendant contends that the facts and duration of the crimes does not support a finding that he intended to inflict cruel or extreme physical or mental pain and suffering.

With respect to evidence of defendant's intent, "because it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008).

In this case, viewed in a light most favorable to the prosecution, a rational juror could have concluded beyond a reasonable doubt that defendant intended to inflict cruel or extreme physical or mental pain and suffering. MCL 750.85. Here, the severe nature and extent of the victims' injuries and the manner in which there were inflicted supported that defendant had intent to inflict cruel or extreme physical or mental pain and suffering. See e.g. *People v Howard*, 226 Mich App 528, 550; 575 NW2d 16 (1997) (noting that "evidence of injury is admissible to show intent"). Evidence showed that Melissa sustained several ligature marks, indicating that the ligature was moved at least once. Melissa also sustained numerous injuries to her body, which supported that defendant did not quickly strangle Melissa, but rather perpetrated a violent assault upon her. Melissa suffered a number of blunt-force trauma injuries to the head, which supported that someone slammed her head against a hard object, or that someone hit her in the head with a hard object. Melissa sustained deep-tissue injuries to her neck, chest, and back all the way to her buttocks, she sustained significant hemorrhaging, and she had injuries to her mouth. Melissa's six-year old daughter stated that she never heard her mother scream like that before, which showed mental anguish and suffering. Despite the screams, defendant did not stop his assault when he knew that Melissa was in anguish. Instead, he intended to inflict more suffering upon her when he continued the attack. Evidence supported that defendant sexually assaulted Melissa.

With respect to McRoberts, Dr. Spitz testified that there was an extended struggle and his death would have occurred within minutes, not seconds. McRoberts not only sustained deep stab wounds to his vital organs, but he also sustained multiple small wounds caused by the tip of a knife. McRoberts also suffered cutting or incise wounds on his body and he had stab wounds to the face, torso, neck, arms, and one through the lungs and heart. Defendant stated to police that at one point he smothered McRoberts' face with a couch cushion to prevent him from screaming. This would have served to increase the mental anguish and pain that McRoberts suffered as defendant killed him with a knife.

In short, viewed in a light most favorable to the prosecution, a rational jury could have concluded beyond a reasonable doubt that the assaults were not quick, but rather, defendant perpetrated them in a manner that evinced intent to inflict cruel or extreme physical or mental pain and suffering. MCL 750.85; *Kanaan*, 278 Mich App at 622.

IV. MOTION TO QUASH

-17-

In an alternative to his sufficiency challenge, defendant contends that the trial court erred when it denied his motion to quash the information with respect to the CSC-I and torture counts.

We review a trial court's decision on a motion to quash the information for an abuse of discretion. *People v Miller*, 288 Mich App 207, 209; 795 NW2d 156 (2010). A court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Babcock*, 469 Mich at 269.

"The purpose of a preliminary examination is to determine whether there is probable cause to believe that a crime was committed and whether there is probable cause to believe that the defendant committed it." *People v Perkins*, 468 Mich 448, 452; 662 NW2d 727 (2003). "To meet its burden of proof at the preliminary examination, the prosecution must present 'enough evidence on each element of the charged offense to lead a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of [the defendant's] guilt." *People v Cohen*, 294 Mich App 70, 74; 816 NW2d 474 (2011), quoting *Perkins*, 468 Mich at 452.

The trial court did not abuse its discretion in denying defendant's motion to quash. *Miller*, 288 Mich App at 209. The prosecutor was not required to prove the charges beyond a reasonable doubt at the preliminary examination stage and instead presented enough evidence to create a reasonable belief of defendant's guilt. *Cohen*, 294 Mich App 74. Specifically, similar to his trial testimony, Dr. Spitz testified at the preliminary examination regarding all of the injuries that both Melissa and McRoberts suffered and his autopsy report was entered into evidence. In addition, Kerrigan and Young testified regarding statements defendant made during their interview. The nature of the victims' injuries coupled with the admissible portion of defendant's statements was sufficient to allow a person of ordinary prudence to form a conscientious and reasonable belief that defendant was guilty of CSC-I and torture as charged. *Id*.

Affirmed.


/s/ Douglas B. Shapiro
/s/ Peter D. O'Connell
/s/ Stephen L. Borrello

-18-